Filed 10/7/14  P. v. Hall CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ADAM HARRISON HALL,<br><br>    Defendant and Appellant. | G048269<br><br>(Super. Ct. No. 11CF1355)<br><br>O P I N I O N |
| In re ADAM HARRISON HALL<br><br>    on Habeas Corpus. | G049377 |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Original proceedings; petition for a writ of habeas corpus, after judgment of the Superior Court of Orange County.  Petition denied.

Richard Schwartzberg for Defendant, Appellant and Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

\*　　　\*　　　\*

## I.  INTRODUCTION

This is a murder case.  Sunday morning, February 13, 2011, Mara Lynnes Steves was walking a dog, and arrived at the northeast corner of the intersection of Moulton Parkway and Nueva Vista in Laguna Niguel.  William Hall was driving a large silver Ford Explorer heading north on Moulton.  He ran a red light, hit a smaller green Toyota Forerunner in the intersection, then veered off in a northeasterly direction toward Mara, killing her.  The Explorer slid on to the curved wall beyond Mara, then bounced off that wall and came to a rest on a small greenbelt about 20 feet north of the intersection.  Hall was under the influence of a number of psychotropic drugs at the time, including Xanax.

Hall wasn't immediately arrested.  A number of witnesses looking at the aftermath of the accident told police they thought the Explorer was turning right from Nueva Vista and was hit by the Forerunner as it ran the light going north on Moulton.  That impression was a reasonable one given the way the two vehicles had ended up after the accident, with the Explorer on the greenbelt *as if* it had been turning right.  So Hall was not immediately arrested.  Only after careful reconstruction of the accident did it become apparent that Hall was the driver who ran the red light on Moulton.

The police caught up with Hall three months later, when he had his nurse-girlfriend (herself an addict) forge prescriptions for Xanax.  After successfully obtaining Xanax from a pharmacy in Irvine, he tried the same thing a few days later at a pharmacy in Placentia.  An alert pharmacist phoned to confirm the prescription and discovered it was a forgery.  When Hall left the pharmacy empty-handed, the police were waiting for him.

Hall was tried both for both Mara's death and the Xanax prescription forgeries. The jury convicted him on one count for Mara's death and three counts for the prescription forgeries. He now contends it was ineffective assistance of counsel for his public defender not to have moved to sever the forgery counts from the murder count. He also contends there was insufficient evidence to show he was the driver who ran the red light. As we explain at length below, Hall is incorrect as to both assertions.

We first deal with the substantial evidence of murder issue, because the ineffective assistance of counsel issue depends, to a significant degree, on the strength of the evidence against Hall as it relates to the murder issue. As we show below, the case against Hall was much stronger than he gives it credit for in this appeal. In fact, considering all the evidence, the case was remarkably strong. As to the ineffective assistance of counsel issue, Hall is unable to show that the trial court would have abused its discretion if it had denied the hypothetical severance motion he now claims his trial counsel should have made. The forgery evidence would have been admissible in Hall's murder trial even if no formal forgery charges had been filed. We note that in the murder trial the prosecution needed to show not only that Hall ran the red light, but also that he was under the influence of psychotropic drugs at the time. The forgery evidence showed the degree of Hall's need for the powerful psychoactive drug to which he had a continuing addiction, and thus had a tendency in reason to prove malice in the form of disregarding the danger of using it and driving – a danger of which he had been warned.

## II. FACTS

A. *Photographic Evidence*

The accident occurred about 11:10 a.m. on Sunday morning, February 13, 2011, at the intersection of Moulton Parkway and Nueva Vista in Laguna Niguel. Here is what the accident looked like soon after it happened, as shown in People's exhibit 48:

3



There is no question the cause of the accident was that one of the drivers ran a red light going north on Moulton.  People's exhibit 8 shows that Moulton is a major thoroughfare while Nueva Vista is a residential street:



Other pictures, also taken in the aftermath of the crash, were entered into evidence to show the jury how the cars ended up after the collision.  The green Forerunner came to a stop with its left front hood and tire area crunched into a light pole on the northeast corner of the intersection.  However, pictures also showed (one of the

4

most dramatic is People's exhibit 35) that the Forerunner had sustained considerable damage to its *right* hood and tire area – in fact, so much so the vehicle was completely missing its right front tire. That tire, as it turned out, rolled northward on Moulton and was found on the right side of the street maybe 40 feet or so beyond the intersection. People's exhibit 42 showed that the Forerunner had sustained damages to both its *right-* front side engine area – where the tire went missing – and to its right *rear* passenger door, but *not* to its right front passenger door. (The door might have been slightly ajar from the frame, otherwise it looked pristine.) A straight on view of the Forerunner's right side shows a bashed rear passenger door, an undamaged front passenger door, and a totaled right front wheel area. The significance is that it looks like the Forerunner was hit, spun around, and hit again.

Beyond the Forerunner to the northeast, the silver Explorer came to a rest on the small greenbelt area just in front of the curved wall on the northeast corner of the intersection. The wall announces a housing development. Prior to the collision, the wall had the words "Rancho Niguel" on it in large letters. People's exhibit 46 showed that the silver Explorer had hit the curved wall, knocked down the letters "anc," bounced off the wall and come to rest some feet beyond the wall, facing northwest. The Explorer, as shown by People's exhibits 44 and 58, sustained damage to both its right front – and left front – ends.

A picture of the intersection also showed a pattern of skid marks that indicated the green Forerunner had been hit and spun around. Here is People's exhibit 25 in that regard:



As the picture shows, immediately before the Forerunner's resting place there is a circle of skid marks, and before the circle there is a distinctive straight skid mark pointed right at the wall; the effect is a kind of "q" shape.

Still more photographic evidence was introduced to show Hall, the driver of the silver Explorer, had been traveling north on Moulton that morning. People's exhibit 20 shows a young white male in what could be his 20's, in wrap-around dark glasses wearing a black armless shirt, making a purchase at a gasoline station on Moulton which is *south* of the Nueva Vista intersection, while several other exhibits show a silver Explorer at that gas station at about 11:08 a.m. on the morning of the collision. The young man in the picture appears to have tattoos on his left forearm, but the nature of the tattoos is somewhat blurry. People's exhibit 111, on the other hand, shows a definitive picture of Hall at a pharmacy three months later (trying to negotiate a forged prescription for Xanax) – no dark glasses and wearing a rumpled bluish sport shirt rolled up showing his forearms. That picture also shows blurry tattoos on the left forearm.

Of further significance in regard to Hall's direction of travel is a comparison of People's exhibit 19, which is a picture of the left side of *a* silver Explorer at the gas station at 11:07:58, and People's exhibit 41, which is a picture of *the* silver Explorer involved in the collision. The picture of the Explorer taken at the gas station shows that the left rear wheel (not many cars have hubcaps anymore) is shaped into a kind of five-spoked star. If one thinks of this star in an upright position, so that the two bottom spokes are like a person's legs pointing at about 5 and 7 o'clock, the two side spokes are slightly raised, pointing out at about 2 o'clock and 10 o'clock, and the top spoke at 12 o'clock, one notices this: On the picture of *the* Explorer involved in the collision, there is writing on the left rear tire ("DynaPro A's" per People's exhibit 41) that arcs from the 10 o'clock arm all the way to the 2 o'clock arm, including going over the 12 o'clock top spoke. And there is writing on the tire ("Hancook," also per People's exhibit 41) spanning the 5 to 7 o'clock legs. The rest is black tire. While the exact writing on the picture of the particular Explorer which was at the gas station that morning cannot be made out, it appears to follow the same pattern of two arcs, one spanning 10 to 2 o'clock and another spanning 5 to 7 o'clock.

In regard to Hall's being on Moulton, the prosecution also introduced the testimony of a sheriff's deputy who had a conversation with Hall at the hospital to which he was taken after the accident (Hall had a broken leg). Hall said he was traveling north on Moulton after having left a Shell station and thought he "had a green light and somebody broadsided him."

B. *The Percipient Witnesses to the Accident*

The green Forerunner was being driven by Steven James, a Cal-State Fullerton anthropology professor. Accompanying him was Anne Gaffney. Gaffney was his girlfriend at the time; they are now married.

James testified that they were on their way to meet some graduate students to go hiking. The grad students were located in the residential tract on the west side of

Moulton.  Proceeding east on Nueva Vista heading to the Moulton intersection, James missed the turn off into a residential tract.  Nueva Vista being the relatively narrow street it is, James soon found himself coming up on Moulton with the need to turn around.  He testified he was looking for a place to make a U-turn, went across Moulton and made a U-turn on a green light, but then, as he put it at trial, "that's when I was hit."[1]  James was very clear he was never going north or south on Moulton.

Anne Gaffney told a similar, but not identical, story.  Having missed the turn off, they "continued to cross Moulton" on a green light looking for a "place to turn around and come back."  But in Anne's story they never got to make that U-turn, and they were unequivocally going east at the time of the collision.  She testified:  "Well, the light was green.  We went through and *we were hit very hard on my right-hand side, on the passenger side*, and we were hit with such force my head broke the window which had been rolled up."[2]  (Italics added.)

But there were four more prosecution witnesses.  One was a woman named Carol.  Carol was driving south on Moulton, coming up to the intersection at the time of the collision.  Carol slowed for a red light on Moulton,  looked down for a moment, and *heard* a collision.  She looked up and saw at least one vehicle spinning, but didn't notice which one.   She saw a tire rolling down the road and thought it came from the "gray vehicle."[3]

A man named Mark was traveling north on Moulton, and saw the aftermath of the collision.  Mark added one fact of topography that is apparent from both of the

---

[1]      A careful reading of James' testimony is consistent with two different ways the collision could have happened.  Either James first crossed the intersection going east, got to the other side of Nueva Vista, made his U-turn, and then, having made a U-turn so he was now going *west*, proceeded into the intersection and was struck by the silver Explorer speeding from the south.  The other interpretation is that James was proceeding *east* across Moulton in order to make his U-turn on the Nueva Vista side of the street, but before he got there he was hit.

[2]      Readers should note that Gaffney's account corresponds to the latter of the two possible scenarios outlined in footnote 1 above.  Cross-examination did not explore the discrepancy between the possibility James had already made his U-turn and was heading *west* and Gaffney's basic story that, because their car was hit on the passenger side, they had to have been going *east*.

[3]      The photos showed the only vehicle to lose a tire was the *green* one.

photographs reproduced in this opinion – the intersection of Nueva Vista and Moulton is at the crest of a hill.  He gave a statement to police at the time saying he was following what "might" have been, or what he "thought," was a green car.  Mark thought this green vehicle had run a red light on Moulton.  In his statement he also said he saw an SUV (sport utility vehicle) pulling out of the east side of Nueva Vista, heading west.  He "thought" that SUV was "silver."  Mark also thought this SUV had been turning right.  At trial, though, Mark was more equivocal.  He said he didn't see "the directions from which the cars came prior to the collision" and only remembered the "intersection after the collision."   While, on the one hand, he said at trial that in "retrospect" he still believed it was the green car that ran the red light, he also stated "I can't honestly say which car it was that I was following" and "As I replay the whole sequence of events leading up to it, I have no actual visual image in my mind of seeing a green SUV.  I know there was an SUV in front of me."

Another prosecution percipient witness was a woman named Linda.[4]  Linda was a passenger in a car being driven by her then 16-year-old son eastward on Nueva Vista at the time of the collision.  Linda was acting as a kind of driving instructor for her son, so she remembered telling him to "stop a little bit because a car was coming towards us."  More specifically, she said that vehicle was in a lane that meant it might turn right or go straight across the intersection.  Either way, Linda wanted her son to see that car and take it into account in making the left turn he was about to make.

Linda alluded to the possibility a car might have been on her *right*, one which necessarily would have been going east on Nueva Vista.  She mentioned a car "from the side of me."  She further testified a car from the far right lane of northbound Moulton went into the intersection and crashed into *a car coming from her right side*. She remembered that the cars spun and there was a woman at the corner – unfortunately

4        This is the Linda who drew the green "C" and the green "L" on the picture of the intersection reproduced earlier.

the pedestrian victim of the collision – who "flew in[to] the air." Linda didn't remember the color of the car that ran the light, or the color of the car going the other way. However, on cross-examination Linda said she didn't recall a car passing her on her right.

The prosecution also presented the evidence of a man named Daniel, who was jogging with his dog on the west side of Moulton, heading north, at the time. Daniel was thus catty-corner to the victim Mara, who was standing with a dog on the northeast corner of the intersection. Daniel was worried Mara would cross the street, and his own dog would react to her dog. He looked down, and heard a collision, but didn't see the actual crash. When he looked up, he saw a silver vehicle "flip up" onto the greenbelt and the green SUV spin backwards and head into a pole. He was clear that he "did not see the actual impact or see any of the directions that either of the cars were going."

The defense presented three percipient witnesses of its own. One was Linda's son John F. He was the 16 year old driving the car in which she had been a passenger. John F. said they were heading east on Nueva Vista going into the intersection, got into the left hand turn lane, and stopped. There was a car on the other side of Nueva Vista, but John F. didn't know if it would go through the intersection or turn right, and it was *that* vehicle that was hit from a car coming from the right on Moulton. John F., like his mother, didn't remember any car passing on his right. He didn't remember the colors of any of the vehicles either.

A second defense witness was a woman named Rose. Just as defense witness John F. was prosecution witness Linda's son, so defense witness Rose was prosecution witness Carol's daughter. Rose was in the front passenger seat as she and her mother approached the intersection from the north on Moulton. She noticed a vehicle coming from the south on Moulton run the red light. Rose also said that the car "coming north was the green one." She testified she "looked up and . . . saw a car coming through the intersection and hit another car." On cross-examination, however, she did acknowledge that her placement of the spot of the actual collision was inconsistent with a

right turn by a car turning right onto Moulton from Nueva Vista. John G. was going north on Moulton in the far right hand lane (the one next to the bike lane), and observed a green SUV. He testified that "they did not appear that they were going to stop" despite the red light. The green SUV was ahead of him, one lane over, and "more ahead of me because I was back a little bit." John G. testified the green SUV did not stop and went through the intersection. He also saw "a silver pickup truck from the northeast corner [that] was either going forward or taking a right turn" and "appeared from the northeast side of the intersection." That silver vehicle went into the intersection.

John G. testified he actually *saw* the collision – he wasn't just looking down at the precise moment of impact – and he was clear he saw the green vehicle run the red light. John G. also testified that when he stopped to render aid, he heard the driver of the green vehicle utter the words, "What have I done?" He did acknowledge, though, that there were "a lot of cars" going north on Moulton that morning, and admitted there were cars between him and the intersection in both his lane and the next one over.

C. *Expert Evidence*

Both sides presented expert accident reconstruction evidence. The prosecution's expert, Wesley Vandiver, opined that the silver Explorer collided with the green Forerunner so as to cause the Forerunner to spin. Vandiver further opined that damage to the Forerunner's radiator and engine had left fluid marks in the road in a radial pattern. (Readers here might recall the circle in the "Q" in the picture showing the skid patterns, reproduced above). Vandiver further noted that the Explorer actually sustained more damage to its front passenger compartment than the Forerunner, which indicated that the Explorer hit the wall at a relatively high speed. He calculated that speed to be about 62 miles an hour. He opined a long scuff mark left in the intersection pointing at the wall (the tail in the "Q" in the second picture) appeared to come from the Explorer's left rear tire.

11

Vandiver presented a video of his reconstruction, received into evidence as People's exhibit 100. In it, a green vehicle traveling east on Nueva Vista going across the Moulton intersection is hit by a speeding silver vehicle coming north on Moulton. The green vehicle spins, causing it to hit the silver vehicle in a secondary collision, and comes to a stop in front of the light pole. Meanwhile, the silver vehicle, traveling fast across Nueva Vista, is deflected by the green vehicle, slides over the sidewalk, hits the curved wall, and comes to a stop, having careened off that wall, facing northwestward. Vandiver's reconstruction does not show the silver vehicle hitting the pedestrian.

The defense's reconstruction expert was Christopher Gaynor. Gaynor's version of the collision was that the green Forerunner was traveling north on Moulton at a high speed, ran the red light, and hit the silver Explorer as the silver Explorer was coming from the east side of the intersection and turning *left* onto Moulton in order to travel south. Gaynor's conclusion the silver Explorer was turning left was in part based on a filament in the vehicle's left turn signal light, which showed a deformation different from the brake light bulbs. For Gaynor, the deformation indicated the left turn signal was *on*, but the brake lights weren't, indicating the possibility of a left-hand turn.

Gaynor's video simulation (Defense exhibit 3) encapsulated his theory of events: The silver Explorer slowly proceeds into the intersection to turn left, at which point it is hit by a speeding green Forerunner. It is worth noting here that Gaynor's video simulation shows the silver Explorer making a very tight left hand turn – so tight, in fact, that it appears to be heading for the fast lanes of the north-bound side of Moulton, as distinct from a wider, looser left hand turn that one might make if one were heading for the south-bound side of a wide parkway.[5]

---

[5] A fact that did not go unnoticed by the prosecutor, who argued to the jury in his closing that Gaynor had set up "an unreasonable pre-collision path for both SUV's."

12

D. *Drug Evidence*

Hall was taken to a hospital on the day of the accident, having sustained a broken leg. Hall's blood was drawn at the hospital *prior* to the administration of any drugs by the hospital, and Hall was found to have Xanax (alprazolam), Valium (diazepam), Vicodin (hydrocodone), morphine and methamphetamine in his system.

Hall was not arrested that day. (As we have noted, a number of witnesses thought the silver Explorer had been turning left from Nueva Vista onto Moulton.) In fact, he wasn't arrested for another three months. It turned out that Hall had a girlfriend (herself addicted to opiates) who worked for an oncologist, and his girlfriend would call in (phony) prescriptions on Hall's behalf using her doctor's authorization code. Hall succeeded in obtaining Xanax from an Irvine pharmacy on May 20, 2011, and tried it again at a Walgreens in Placentia four days later. But this time the pharmacist called the oncologist's office to verify the prescription and learned it was fake. When Hall came into the store to pick up the prescription he was sent away empty-handed, and police were waiting outside to arrest him.

Additionally, the prosecution introduced evidence of two convictions previous to the February 2011 collision, where Hall was found to have been driving with Xanax in his system – one in October 2007 and one in May 2008. In the aftermath of the May 2008 arrest, Hall took a class in which he learned that causing a death while under the influence of drugs can lead to a murder charge. (See generally *People v. Watson* (1981) 30 Cal.3d 290.)

E. *The Trial*

Hall was charged with five counts. A felony complaint was filed May 23, 2011 (three days after the successful Irvine forgery), but it only included

13

two counts, both based on the February 2011 collision: count 1 was for Mara's murder (Pen Code, § 187, subd. (a)),[6] while count 2 charged Hall with having inflicted bodily injury on the driver of the green Forerunner and his girlfriend (Veh. Code, § 23153, subd. (a)). In late June 2011, after Hall's May 24, 2011 arrest, the felony complaint was amended to add three counts based on the forgery of prescriptions for Xanax and the success of the forgery on May 20.[7]

At trial, Hall offered no defense of the three forgery counts, a point noted by the prosecutor in his closing rebuttal. The jury returned guilty verdicts as to count 1 and counts 3 through 5, but found Hall not guilty of *felony* causing bodily injury to the professor and his girlfriend; instead it only found him guilty of *misdemeanor* causing bodily injury as a lesser included offense of the felony count. Hall was sentenced to 15 years to life for count 1 (Mara's murder), plus an additional two years, to run consecutive to the murder count, for one of the forgery counts. Of the remaining two forgery counts, one was stayed (see § 654) and the other was to run concurrently. This appeal followed.

### III. DISCUSSION

Two issues are presented in this appeal: (1) whether substantial evidence supported the guilty verdict based on Hall's having caused the collision by running the red light on Moulton that morning; and (2) whether it was ineffective assistance not to try to sever the forgery counts from the collision counts.

A. *Substantial Evidence*

Appellant Hall argued that the only substantial evidence that he, rather than James, ran the red light was Vandiver's reconstruction; James and Gaffney obviously lied – lest James be found liable for Mara's death, as well as for their own and Hall's injuries – and all the other eyewitnesses saw the green Forerunner run the red light. Given that

_____

[6] All undesignated statutory references in this opinion are to the Penal Code.

[7] Count 3 was for the successful forgery on May 20 (Health & Saf. Code, § 11368), count 4 was for the forgery necessary to attempt the unprescribed Xanax on May 24 (also Health & Saf. Code, § 11368) and count 5 was for the same thing (forgery), except under a different statute (Bus. & Prof. Code, § 4324, subd. (a)).

14

Vandiver was not there, the evidence supporting the conviction is insufficient. (Cf. *People v. Johnson* (1980) 26 Cal.3d 557, 578 ["We think it sufficient to reaffirm the basic principles which govern judicial review of a criminal conviction challenged as lacking evidentiary support: the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."]; see *People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [quoting *Johnson*]; *People v. Carter* (2005) 36 Cal.4th 1215, 1257-1258 [quoting *Hillhouse* quoting *Johnson*].)

But this is simplistic. It turns out that not only was there substantial evidence to support the jury's finding Hall ran the red light, it is hard to imagine a reasonable jury coming to any *other* conclusion. Hall's briefing understates the evidence considerably. The evidence that Hall ran the light on Moulton consisted of far more than merely Vandiver's reconstruction. In fact, Vandiver's reconstruction was not even needed to establish guilt.

First, no one offered any evidence that the cause of the collision (and concomitantly Mara's tragic death) was anything other than a vehicle going north on Moulton running a red light. *All* eyewitnesses, including the defense's best witness, John G., either directly testified to that fact or – if they didn't actually see the collision – testified to an impression of the accident consistent with it. And if the accident was caused by a motorist going north on Moulton, the jury had both the gas station photos *and* Hall's admission to a deputy sheriff at the hospital to support a conclusion Hall was that motorist and could have stopped there.

Second, James and Gaffney both testified consistently that they had been coming from Nueva Vista at the time of the accident; James testified he was in the process of making a U-turn, Gaffney testified they were crossing the intersection in order to make one. Further, James and Gaffney both presented a credible and consistent reason

15

to be traveling on Nueva Vista (to visit a grad student or students), and there was no evidence *Hall* had any reason to be coming westward on Nueva Vista that morning. Again, the evidence suggests it was Hall who was northbound.

Third, James and Gaffney told *reasonably* consistent stories about the circumstances of the accident given the suddenness of the impact that clearly surprised them both. A reasonable jury could find it at least plausible that James was going through the intersection heading east, planning to make a sloppy U-turn in the intersection, was about to make one, and was suddenly hit by a speeding car from Moulton.[8] Gaffney might not have been aware that James was about to commence a U-turn, and, from her point of view, the collision seemed exactly as Vandiver reconstructed it – a green vehicle traveling east on Nueva Vista crossing the intersection was hit by a speeding silver vehicle traveling north on Moulton running a red light. Moreover, the fact that James and Gaffney told *slightly* different stories does not diminish their credibility. As husband and wife by the time of trial they no doubt could have rehearsed every detail of their stories to make them identical. So there was no dispositive reason to disbelieve James and Gaffney, despite their obvious self-interest in a story in which they had the green light.

Fourth, John G., the witness on whom the defense relied the most, did not have a totally clear view of the collision. He admitted on cross-examination that there were two to three cars in the lane ahead of him, plus cars between him and the green vehicle he believed he saw run the red light. Compounding that visual obstruction, as witness Mark explicitly stated – and what is fairly obvious from many of the pictures of the accident scene – a person traveling north on Moulton heading toward the Nueva Vista

---

[8]     Likewise, a reasonable jury would be justified in not reading too much into James' statement after the collision, "What have I done?" A conscientious and innocent person might readily say same thing under similar circumstances.

16

intersection is *cresting* a hill. Given those visual obstructions, a reasonable jury could discount John G.'s recounting of events as simply mistaken.

Fifth, and particularly in regard to the possibility of visual mistakes, there was no doubt that both (a) the accident happened very fast (which is what one would expect if a vehicle ran a red light going 60 miles an hour) and (b) the silver Explorer ended up in a position that, *at a superficial glance,* suggested it was coming from Nueva Vista, and in the process of making a right hand turn at the time of the collision. Of the six percipient witnesses other than James, Gaffney, and John G., four of them (Carol, Mark, Daniel and Rose) all testified in some way that they didn't actually see the collision – they looked up afterwards. Under such circumstances, it is not surprising they might remember a vehicle (most could not remember the colors) that was turning right onto Moulton coming west on Nueva Vista – because that's what a person who didn't see the accident, but who immediately looked up *afterwards*, might naturally think.[9] Of the two other witnesses, mother and son Linda and John F., both were preoccupied with young John F.'s driving, and could naturally be expected to remember a car ahead of them, either coming or going on Nueva Vista, in the intersection. As with the other witnesses, Linda and John F. retroactively believing they saw a vehicle turning right would be a natural conclusion given the way the silver Explorer ended up on the greenbelt.[10]

Sixth, and most dispositively, the jury had plenty of pictures of the scene right after the accident. One need not to be versed in accident reconstruction or able to calculate centers of gravity or "friction values" to see that, intuitively, the prosecutor's version of the collision was a reasonable one: A heavy Explorer traveling north at a high

---

[9] People *can* remember things that didn't happen. (Cf. *Trear v. Sills* (1999) 69 Cal.App.4th 1341, 1345-1346 [recounting story of the famous developmental psychologist Jean Piaget who vividly, but falsely, remembered being kidnapped as a child – in reality his nurse fabricated the story and he remembered it as true].)

[10] The strength of the eyewitness testimony in this regard (a vehicle turning right) is also somewhat undercut by the fact that the police made them wait for more than an hour before taking their statements, during which at least some of the eyewitnesses talked among themselves or overheard others talking about the accident.

rate of speed hit a green Forerunner, causing the Forerunner to spin, while the Explorer was deflected in a northeast direction toward the wall, and was going so fast it still had enough momentum to bounce off the wall and go another 20 or so feet. By contrast, the defense version of the collision had *no* eyewitness support at all – no one testified any car was turning *left* into southbound Moulton.[11] Given such evidence, and the conclusions that could reasonably be drawn from it – whether or not we ourselves would draw them – we cannot say the jury's verdict was unsupported by substantial evidence.

B. *Ineffective Assistance and The Motion to Sever*

We summarize Hall's ineffective assistance of counsel argument this way: At least seven disinterested eyewitnesses did not corroborate the prosecution's version of the collision – all of them, as discussed above, had a car turning right – and one of those witnesses (John G.) was unequivocal in testimony that would have meant Hall's acquittal of the murder charge. On top of that, there was the jury's inconsistent refusal to convict Hall of causing great bodily injury to James and Gaffney.[12] So the case was winnable. But Hall's defense was effectively contaminated by trial of the three forgery counts. The presence of those counts allowed the prosecutor to weave the pungent and indefensible theme of "Hall-the-incorrigible-druggie" into a case that otherwise revolved around the painstaking and somewhat tedious reconstruction of a traffic collision. Had the three forgery counts been severed, the prosecutor would not have been able to remind the jury as often as he did that Hall has a serious drug addiction problem, and without those reminders the jury might have been more readily disposed to conclude there was a reasonable doubt as to Hall's running the red light on the morning of February 13, 2011.

---

[11] The defense's video was particularly problematic, showing a silver Explorer turning suicidally into oncoming northbound traffic.

[12] Inconsistency in the verdict is no basis for reversal. In 1927 the Legislature amended section 954 to make it clear a verdict on one count does not affect a verdict on another. (See *People v. Brown* (1985) 174 Cal.App.3d 762, 769.) The basic theory is that an inconsistent verdict is either the result of jury confusion or an act of mercy. (See *People v. Amick* (1942) 20 Cal.2d 247, 251-252.)

Hall has also filed a petition for habeas corpus, in which he makes this same basic argument, but includes the declaration of his appellate counsel, who declares that in his professional expert opinion as a lawyer of 36 years focused on criminal defense that there was no reason a competent lawyer would *not* have brought a motion to sever the three forgery counts. And, as Hall's reply brief notes, the Attorney General's office has offered no declarations or any evidence in rebuttal to that declaration.

We agree with Hall's appellate counsel on the question of whether Hall's trial lawyer might have had a tactical reason not to bring a motion to sever. We can't think of any good reason either. The Attorney General's office says not making the motion invited the jury to come to a "compromise verdict" in which Hall would be acquitted of murder but convicted of forging prescriptions. That is, the forgery prescriptions had the tactical effect of distracting the jury so as to allow Hall's argument about not running the red light to seem more "reasonable."

We think not. The theory of a tactical reason is wishful thinking on the Attorney General's part. Hall presented no defense to the forgery counts, so their presence simply allowed the prosecutor yet more opportunity to drive home the fact of Hall's drug habit. Going into the trial, the focus of the case was obviously going to be the murder and great bodily injury counts, so the ability of the forgery counts to distract the jury or otherwise invite a compromise verdict was negligible: A jury was not going to let Hall off a murder charge just to convict him of crimes that were basically a given to begin with and carried relatively less severe penalties. And nothing in counsel's trial or argument of the case fits with that tactic. If the motion was not brought for that reason, we would have expected to see signs of counsel trying to take advantage of it. We see none.

But just because trial counsel may not have had a good reason not to make a severance motion does not mean it was ineffective assistance not to make it. The standard for ineffective assistance is not whether trial counsel *might* have done something

19

that *might* have made a difference. Rather, as *Strickland v. Washington* (1984) 466 U.S. 668, 687, framed the standard, the question is whether trial counsel's deficiency was *so serious* that the defendant was deprived of a fair trial, i.e., counsel's deficiency produced a result that is unreliable.[13] Under the *Strickland* standard, not only must trial counsel have been deficient, but the deficiency had to be prejudicial. Elaborating, *Strickland* was clear that in evaluating prejudice, courts should use a *reasonable probability* of a different outcome standard. (See *id.* at p. 694 ["The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."].) Our own high court has been reiterating the reasonable probability standard since 1987 in *People v. Ledesma* (1987) 43 Cal.3d 171, 218, and continues to do so to the present (see *In re Champion* (2014) 58 Cal.4th 965, 1007).

Based on a reasonable probability standard, we can hardly say this trial counsel's failure to bring a motion to sever constituted ineffective assistance. There are two basic reasons: First, as a matter of simple stare decisis, the California Supreme Court has held that a predicate to a successful ineffective assistance argument for failing to bring a motion to sever is that it must be shown it would have been an abuse of discretion for the trial court not to have granted such a hypothetical motion. (See *People v. Maury* (2003) 30 Cal.4th 342, 392 [rejecting ineffective assistance of counsel claim where "trial court would not have abused its discretion by denying a motion to sever" that was never

---

[13] Here is the *Strickland* court's own summary of the doctrine: "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors *so serious* that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were *so serious* as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland, supra*, 466 U.S. at p. 687, italics added.)

made]; *People v. Hawkins* (1995) 10 Cal.4th 920, 941 [no ineffective assistance for failing to make motion to server where it would not have been abuse of discretion to deny motion had it been made].[14])

Here, a trial court would have been within its discretion to deny a hypothetical motion to sever the three forgery counts. Under section 954, different offenses within the same "class of crimes" may be joined together in an accusatory pleading. The Supreme Court has defined "class of crimes" within the meaning of the statute to be those "possessing common characteristics or attributes." (*People v. Kemp* (1961) 55 Cal.2d 458, 476.) Under section 954.1, such same-class offenses may even be joined together even if evidence as to one or more of them is not admissible as to the rest.

What constitutes the "same class of crime" can be illustrated by *People v. Koontz* (2002) 27 Cal.4th 1041, 1074-1075. There, the prosecution was allowed to consolidate a petty theft from a department store with charges of murder, robbery and vehicle taking committed a month later at a different location. As our Supreme Court described appellant's argument, he complained that "the requirements of section 954 were not met in his case because the petty theft and murder are offenses of different classes and the Woolworth's theft and the Martinez homicide were not connected in their commission. Further, he argues, evidence of the two offenses was not cross-admissible, and the theft charge served only to prejudice him in the jury's eyes by casting doubt on his veracity. He contends that had the trial court denied joinder, it is reasonably probable he would have achieved a more favorable result at trial."

---

14      *Hawkins* is not cited in any of the briefs, including the Attorney General's. Legal computer databases typically red flag the opinion because of a reference to it in *People v. Lasko* (2000) 23 Cal.4th 101, 109-110. *Lasko*, however, disapproved *Hawkins* on an entirely different point than what *Hawkins* said about the motion to sever. Specifically, *Lasko* went to some pains to point out that an "unlawful killing without malice (because of a sudden quarrel or heat of passion) is voluntary manslaughter, *regardless* of whether there was an intent to kill." (Italics added.) In the process, the *Lasko* court rejected the "fleeting observation" made in a 1917 case, *Drown v. New Amsterdam Casualty Co.* (1917) 175 Cal. 21, 24, to the effect that there *must* be an intent to kill for voluntary manslaughter. In its sweep of disapproval of that statement, the *Lasko* court cited a number of cases that had "repeated" *Drown's* fleeting observation, including *Hawkins*. (See *Lasko, supra*, 23 Cal.4th at pp. 109-110.) We may therefore take *Hawkins* as good law on ineffective assistance of counsel.

21

This is, of course, indistinguishable from the argument made here. The Supreme Court rejected it, explaining, "[W]e may reasonably conclude these offenses fall within the same class, in that they share the common characteristic of the wrongful taking of another's property. [Citations.] As such, their joinder was proper." By parity of reasoning, driving under the influence of a drug and forging a prescription for the obtaining of the very same drug, are of the same class, in that they share the common characteristic of the wrongful use of drugs.

Furthermore, it might well be said that the common characteristic here is not just Xanax, but Hall's evident uncontrollable need to medicate himself with Xanax even after having two previous convictions for driving under the influence. Cravings for Xanax link killing someone while driving under the influence of Xanax with forging a prescription to obtain Xanax. (See *People v. Earle* (2009) 172 Cal.App.4th 372, 418 [sexual motivation was enough to link together assault with intent to commit rape and indecent exposure].)

Beyond the commonality of all the counts, the three major factors bearing on motions to sever would hardly compel severance here. The factors were recounted in *Alcala v. Superior Court* (2008) 43 Cal.4th 1205: (1) cross-admissibility of the evidence of the counts; (2) whether some counts may have a tendency to inflame the jury; and (3) the relative strengths of the counts, i.e., have weak counts been joined with strong ones to give the weak counts an unfair boost. (See *id*. at pp. 1220-1221.[15]) These three factors militate, if anything, in favor of denying a severance motion:

(1) The forgery evidence was relevant to the murder charge, because it went directly to the malice count in the murder charge a la *Watson*. (See *Watson, supra*, 30 Cal.3d at p. 300 ["malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a

---

[15] *Alcala's* recapitulation of the factors included a fourth – whether joinder of some counts might convert a murder charge into a capital case – but that factor is obviously not applicable here.

22

wanton disregard for human life"].) Even after being arrested twice for driving under the influence of Xanax and other psychoactive drugs, and after having been in a terrible accident in which a person was killed in which Hall was driving under the influence of Xanax (even if, arguendo, it was not Hall's fault), Hall was still willing to go to considerable lengths to obtain Xanax. It must also be remembered, in this regard, that Hall pled not guilty to all five counts, which meant the prosecution faced the burden of showing that Hall had voluntarily ingested Xanax prior to the accident and wasn't just given it at the hospital after the accident to calm him down.

(2) The forgery evidence, in the context of the case as a whole, did not have a tendency to inflame the jury. The forgery evidence involved no direct victims and the factual evidence was prosaic – someone called in a false prescription to a pharmacy, Hall showed up to collect it. What inflammatory evidence there was in the case arose out of Mara's death, not the forgeries. Moreover, the prosecution was going to be able to emphasize Hall's drug addiction at considerable length *anyway*, given Hall's two prior DUI convictions.

(3) As we have shown now in considerable detail, joinder of the forgery counts did not pose the danger of bolstering a weak case involving murder by including a strong case involving drug forgeries. The murder case was quite formidable in its own right, and included its own significant Xanax component as well.

Hall's appellate counsel attempts to convert the very relevance of the forgery evidence into a prejudicial factor, by explicitly noting its tendency to prove Hall's malice. He points out that the evidence showed Hall wasn't willing to curb his Xanax addiction after the February 2011 accident, which, addiction being what it is, had a tendency to prove he wasn't willing to curb it prior to the February accident. In pointing this out, however, he has merely emphasized the basic cross-admissibility of the evidence.

23

We might also illustrate the cross-admissibility of the forgery evidence, and underscore our conclusion that Hall cannot show prejudice from the inclusion of those counts, with this hypothetical:  Suppose trial counsel, presciently in tune with what appellate counsel now argues, simply convinced Hall to plead guilty to all three forgery counts.  Would that tactic have prevented the forgery evidence from being presented to the jury?  We think not.  The prosecution would still have been able to present it as relevant to the issue of Hall's continuing addiction as it related to the accident and subsequent hospitalization.  And – taking the hypothetical one step farther – would trial counsel have been able to prevent that relevant evidence from coming in as disproportionately prejudicial in relation to its probity?  (See Evid. Code, § 352.)  Again, we think the answer is no:  As we note in the text above, the forgery evidence was dry, consisting of proof that someone had called in a false prescription for Hall and Hall showed up to collect it.  The failure to make a motion to sever really made no difference.

Finally, the overall effect of inclusion of the forgery charges can hardly be said to rise to the *Strickland* level of having denied Hall a *fair* trial.  The overarching fact in this case is that the jury was presented with hard, photographic evidence that made coming up with a scenario in which Hall didn't cause the accident highly implausible. That a lighter Forerunner supposedly coming north on Moulton hit a heavier Explorer with such force that the Explorer was pushed so hard against the curved wall as to take off three letters and still go another 20 feet or so is, to say the least, counterintuitive.  And the jury was still going to hear evidence of Hall's ill-fated May foray into Xanax prescription forgery, since it was relevant to the malice issue arising out of the February accident as showing Hall's enduring inability to cure his drug habit.  In the totality of the case, the three forgery counts added only marginally to the murder case.

24

## IV.  DISPOSITION

The judgment is affirmed.  The petition for writ of habeas corpus is denied.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.